UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OILFIELD DEVELOPMENT SPECIALISTS, LLC | § § § | |
| Plaintiff, | § § § | Case No. 4:12-cv-01278 |
| VS. | § § | |
| CONDOR EXPLORATION, INC., and CARDINAL RESOURCES, PLC, a/k/a TAUREX RESOURCES, PLC | § § § § | |
| Defendant. | § | |

## DEPOSITION DESIGNATION OF ROBERT JOSEPH BENSH

## DESIGNATIONS

### DATE OF DEPOSITION: JULY 30, 2013

| BEGIN | END |
|---|---|
| 4:15 | 4:17 |
| 29:6 | 29:22 |
| 82:20 | 83:9 |
| 142:23 | 143:5 |
| 148:12 | 148:19 |
| 183:18 | 184:5 |

Respectfully submitted,

*/s/Charles S. Kelley*
Charles S. Kelley
Attorney in Charge
State Bar No. 11199580

1

Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
(713) 238-2634 telephone
(713) 238-4634 facsimile
ckelley@mayerbrown.com

## CERTIFICATE OF SERVICE

    I hereby certify that on the 14th of February, 2014, a true and correct copy of the Deposition Designations of Robert Joseph Bensh were served to the following counsel of record by hand delivery:

Paul Smith
paulsmith@warejackson.com
Timothy Lankau
timlankau@warejackson.com
Ware, Jackson, Lee & Chambers, LLP
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019

/s/Quinncy McNeal

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

OILFIELD DEVELOPMENT )  )
SPECIALISTS, LLC, )
Plaintiff, )
 )
vs. ) CASE NO. 4:12-cv-01278
 )
CONDOR EXPLORATION, INC., ) )
and CARDINAL RESOURCES, ) )
PLC, a/k/a TAUREX )
RESOURCES, PLC )
Defendants. )

ORAL VIDEOTAPED DEPOSITION OF

ROBERT JOSEPH BENSH

July 30, 2013

ORAL VIDEOTAPED DEPOSITION OF ROBERT JOSEPH BENSH, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 30th day of July, 2013, from 9:14 a.m. to 4:37 p.m., before Laurie Carlisle, Certified Shorthand Reporter in and for the State of Texas, reported by computerized machine shorthand at the offices of Mayer Brown, LLP, 700 Louisiana Street, Suite 3400, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
 1                        APPEARANCES
 2
 3    FOR THE PLAINTIFF:
 4
          Mr. Paul Smith
 5        Mr. Timothy Lankau
          WARE, JACKSON, LEE & CHAMBERS, LLP
 6        2929 Allen Parkway, 42nd Floor
          Houston, Texas   77019
 7        Telephone: 713.659.6400
          E-mail: paulsmith@warejackson.com
 8
 9
10    FOR THE DEFENDANTS:
11
          Mr. Charles S. Kelly
12        Mr. Quinncy McNeal
          MAYER BROWN LLP
13        700 Louisiana Street, Suite 3400
          Houston, Texas   77002-2730
14        Telephone: 713.238.2634
          E-mail: qmcneal@mayerborwn.com
15
16
17    ALSO PRESENT:
18
          Mr. Tal Deboche
19
          Ms. Colleen Snow
20
21
22
23
24
25
```

1  THE VIDEOGRAPHER: We are going on the
2  record. This marks the beginning of the deposition of
3  Mr. Robert Bensh. Today's date is July the 30th, 2013,
4  and the time is 9:14 a.m.
5  Will all counsel present please voice
6  identify yourselves for the record and with whom you
7  represent, please.
8  MR. SMITH: Paul Smith for ODS, along with
9  Tim Lankau and Tal DeBauche.
10  MR. McNEAL: And I'm Quinncy McNeal, and
11  Charles Kelly for Condor Exploration.
12  ROBERT JOSEPH BENSH,
13  having been first duly sworn, testified as follows:
14  EXAMINATION
15  Q. (By Mr. Smith) Will you state your name,
16  please.
17  A. Robert Joseph Bensh.
18  Q. Mr. Bensh, my name is Paul Smith, and as you
19  now know, I represent ODS in a lawsuit filed against
20  Condor Exploration, Inc. You know who both those
21  entities are, obviously?
22  A. I do.
23  Q. Have you ever given a deposition before?
24  A. I have.
25  Q. How many times?

1 I saw Canaguaro Investors. I'm not a member of
2 Canaguaro Investors. I don't know who formed Canaguaro
3 Investors. I can't answer to it. That's the only
4 document where I see that there's the 2 percent
5 override.
6     Now, what I've always understood from
7 Cliff is we owe Luis 2 percent.
8     Q. Do you disagree with Cliff?
9     A. I do because there's no legal document stating
10 it. But I also know how we operate as a group and that
11 is, if we tell somebody that we're going to do
12 something, we're going to make an effort to do it. The
13 problem that we have here are two.
14     There isn't a document. Luis doesn't have
15 a document that's been filed, registered anywhere -- in
16 Colombia, in the United States, with us, with our
17 partners -- that claims the 2 percent. That's the first
18 problem.
19     So now, with us, our response would be,
20 Okay, we'll get over that. We'll make it up to Luis.
21 There's nothing to make up. As I mentioned before,
22 there's no equity value here whatsoever.
23     Q. That's the second problem, there's no equity --
24 you said there were two problems?
25     A. Yeah, that's the second problem. You know, to

1  he has an agreement. There isn't an agreement signed.
2  Our belief to Luis is if there had been some equity
3  value in this, there would have been an opportunity to
4  pay money that we would like to pay you. There's
5  nothing here, and there's no legal agreement. Where's
6  the case?
7         I'm sitting in the middle of this table.
8  I think I view you and Mayer Brown as trying to clear up
9  a misunderstanding. You're going to say there's a legal
10 case. I just see this as pretty misfortunate for Luis
11 in particular because my view is he's spending money
12 that there's nothing to chase. There's no business
13 deal. I mean, it all comes down to business, right?
14        MR. SMITH: Objection, nonresponsive.
15   A.  There's nothing there.
16   Q.  (By Mr. Smith) You say there's nothing there,
17 Mr. Bensh, and I hear you. You've said that several
18 times.
19   A.  Yes.
20   Q.  What do you know about the production of the
21 Canaguaro field?
22   A.  As of late, I understand it's in the 2 to
23 300 barrels per day range. The reservoirs are quite
24 small. There's nothing to develop. I've seen some
25 valuation cases. I know that there has been anywhere

Page 83

1  between 18 to $30 million spent on the Colombian assets.
2  There isn't enough equity value to recoup your capital
3  investment.
4      I have a lot more at stake from an equity
5  standpoint than Luis does, and I've walked away from
6  this because there isn't equity value for myself and the
7  other equity people that were in this deal. It's just a
8  business deal that has not gone the way that any of us
9  wanted it to go. That happens.
10     Q.  Define "equity value" for me, please.
11     A.  They're A minus B equaling C, A being the
12 investment minus the equity that we have in the deal and
13 it's -- it's not there. There isn't -- so there's --
14 Medley has put in 20, $25 million. The Colombian assets
15 are worth, if you were to sell it today, you might be
16 able to get 12 to $15 million for it. You still owe
17 Medley 10 million bucks.
18     Medley -- Medley could turn around and
19 say, okay, all of you, pay us our money back. I mean,
20 they're not doing that. They've taken an equity
21 position at this point. They're also -- from the
22 production, there isn't enough to even pay their -- to
23 barely pay their interest, let alone the principal that
24 they have on the note.
25     Q.  Have you ever seen a reserve report by Stagg

Carlisle Reporting   713-864-4443

1  their response is going to be very simple. "What
2  documents do you have?"
3             And I'll say none. We have nothing
4  signed. And they'll say, Okay, fine, if you want to pay
5  him a 2 percent override one day, when we're paid, when
6  your obligations to us are paid in full and whatever is
7  left over, if you want to pay him a 2 percent override,
8  we don't care. And that's when I'd turn to Cliff and
9  say, those are the conditions that we have.
10      Q.   Your testimony here today is you've never had
11 that discussion with Cliff?
12      A.   That specific what I just said to you
13 conversation, no. Have I had that directly with him,
14 no. Is it implied in all of our conversation in trying
15 to do what's right for Luis? Yes.
16      Q.   When was the first time you had that implied
17 discussion?
18      A.   I couldn't answer that.
19      Q.   In 2008?
20      A.   I cannot answer that. I would not know. It
21 could have been last week for all I know, but I can't
22 give you a specific time frame.
23      Q.   One way that you could effectuate in your mind
24 an override for Luis would be to take Exhibit 24, the
25 development agreement, and assign that, those

Page 143

1  obligations, to Condor.  That would be one way to do it
2  legally in your view?
3              MR. McNEAL:  Objection.  This is going to
4  call for a legal conclusion.
5      Q.   All right.  Well --
6      A.   I would take it to --
7      Q.   We'll rephrase it.
8      A.   -- lawyers.
9      Q.   He's got an objection.  Let me reask the
10 question.
11     A.   Okay.  Okay.
12     Q.   I'll fix it.
13          From your perspective as CEO of Condor,
14 say in 2007, one way to effectuate Condor having an
15 obligation to pay ODS a 2 percent override would be to
16 take Exhibit 24, the development agreement with CILLC
17 and ODS, and assign it, assign the obligations to
18 Condor?
19              MR. McNEAL:  Counselor, I still -- I have
20 the same objection.  He can answer.
21     A.   In 2007 is when you're asking me?
22     Q.   Sure.
23     A.   Okay.  In 2007 I would have taken this to the
24 board of directors of Cardinal and Condor and gotten
25 their approval or disapproval for the override.  If

1  agreement with ODS and a party that's not affiliated or
2  associated with Cardinal and Condor.
3      Q.  Just so it's clear, you're confident that no
4  information provided by Mr. Quintero and ODS was
5  utilized in Condor striking a deal with those five
6  entities.  That's what your testimony is, really?
7      A.  I didn't say that.
8      Q.  Okay.
9      A.  I did not say that.  I'm saying that this
10 agreement has no effect on Cardinal or Condor.  Because
11 this is an agreement with Canaguaro and ODS.
12     Q.  What if --
13     A.  Cliff West signed it --
14     Q.  -- Condor assumed the obligations of
15 Exhibit 24?
16     A.  It didn't.
17     Q.  How do you know that?
18     A.  But it didn't.  Where is the agreement saying
19 that?
20     Q.  I'm going to show you in a minute.
21     A.  Then let's --
22     Q.  But if there is an agreement between
23 Mr. Quintero and Condor which clearly illustrates that
24 the obligations of Exhibit 24 have been assumed by
25 Condor, does that change your mind about anything?

Page 183

1     A.    I'm asking you.

2     Q.    Actually, I don't think it does. Because
3 that's not what an override is. An override is not
4 burdened by expenses. You understand that, don't you?

5     A.    Well, but this one is.

6     Q.    Yeah. Once $10 million is pulled out?

7     A.    Right. So I mean -- but that's not an override
8 as what you and I disagreed to. What is actually an
9 override now? And basically what it's saying here is
10 once all the money -- once the capital is returned, then
11 you get your override.

12     MR. McNEAL: Objection. Paul, this is
13 going to be interpreted by someone else. Your view is
14 your view, his view is his view. The document speaks
15 for itself.

16     MR. SMITH: I agree the document
17 absolutely speaks for itself.

18     Q.    (By Mr. Smith) But your view of it is,
19 Mr. Bensh, as CEO of Condor Exploration is that in order
20 for an override to kick in on the Canaguaro field,
21 CILLC, under this agreement, would have to have received
22 $10 million net in their pocket. Is that your -- that's
23 your understanding?

24     A.    No.

25     Q.    Okay.

1  A. My understanding of this invalid agreement is
2  that -- my understanding of this agreement would be that
3  once $10 million, invested dollars into Canaguaro was
4  received by the party that invested that $10 million,
5  then the override would kick in.
6  Q. Okay.
7  A. That would be the after payout, the APO that
8  you referred to earlier. What is -- what can be vague
9  is, is it 10 or is it 14? Because you have the Toca and
10 the QR and I would ask for clarification -- I actually,
11 as CEO, would go to an attorney and ask for
12 clarification is -- is it 10 for Canaguaro or is it 14
13 overall?
14             I don't think that this was worded quite
15 well. So I would get a legal clarification. And then I
16 would go back to the parties here and make sure that
17 that was clarified, because I wouldn't want any
18 ambiguity when it's time to get paid out.
19 Q. So is it your understanding that it's never
20 paid out?
21 A. No. I don't know if it has been or not. I
22 don't know -- I don't know what Canaguaro was worth
23 aside from the Stagg report.
24 Q. Right. The Stagg report is actually attached.
25 We can look at that.

STATE OF TEXAS

COUNTY OF HARRIS

### REPORTER'S CERTIFICATE
### ORAL VIDEOTAPED DEPOSITION OF ROBERT JOSEPH BENSH
### July 30, 2013

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 7th day of August, 2013.

*Laurie Carlisle*

Laurie Carlisle, CSR
Texas CSR 2205
Firm No. 395
Expiration: 12/31/13
CARLISLE REPORTING
832 Tulane Street
Houston, Texas 77007